ALBANY,
August, 1808.

Ward
v.
Center.

## Ward *against* Center.

THIS was an action on the case, for a *deceit*. The declaration stated that the defendant, intending to deceive and defraud the plaintiff, falsely and fraudulently affirmed that one *Ebenezer Brown* was worth 5,000 dollars, and that, as far as the said defendant had dealings with him, the said *Brown* had been punctual in his payments, and that he was a responsible man, and thereby falsely, fraudulently and deceitfully procured the plaintiff to sell to the said *Brown*, upon trust and credit, goods to the value of 618 dollars and 84 cents ; and also, that the defendant, on the 23d of *October*, 1806, intending to deceive and defraud the plaintiff, did wrongfully and deceitfully encourage and persuade the plaintiff to sell and deliver to the said *Brown*, other goods, wares and merchandizes, to wit, of the value of 618 dollars and 84 cents, upon trust and credit, and did, then and there, for that purpose, falsely, deceitfully and fraudulently, assert and affirm to the plaintiff, that the said *Brown* was a person safely to be trusted and given credit to, and did thereby falsely, fraudulently and deceitfully, cause and procure the plaintiff to sell and deliver the said goods and mer-

*Whether an action as for a deceit, on a parol affirmation or representation, which is false, as to the credit and responsibility of a third person, whereby the plaintiff was induced to trust such person, in consequence of which he suffered a loss, is maintainable ; and whether fraud, or an intention on the part of the defendant to deceive the plaintiff, or some collusion between the defendant and the person recommended, must not be proved ? Quere. Whether there is fraud or not, is a question of*

fact for the jury to decide, and where there is evidence on both sides, and the jury are not misdirected as to the law, the court will not set aside their verdict.

chandizes, of the value aforesaid, to the said *Brown*, &c. Plea, the general issue.

The cause was tried at the *Albany* circuit, in 1807, before Mr. Chief Justice *Kent*.

At the trial, one *Humphreys*, a clerk of the plaintiff, testified, that on the 23d of *October*, 1806, *Brown* called at the store of the plaintiff, and requested a credit for goods. Upon the clerk's making inquiry into his circumstances, *Brown* referred him to the defendant for information, he being the only one that knew him. The witness applied to the defendant, who told him that *Brown* was a responsible man, as he had been informed by people who resided at the place from whence *Brown* came ; that the defendant had sold his stock in trade to *Brown*, and that he had found, to his satisfaction, that *Brown* was worth 5,000 dollars. The witness then asked the defendant whether *Brown* had been punctual in his payments to him, to which the defendant answered that he had been, as far as he had dealings with him, and that *Brown*, when he first came to *Albany*, was embarrassed to obtain credit. The witness further stated, that while the goods were laying out for *Brown*, in the store of the plaintiff, the defendant came there, and said that he had come to see the plaintiff, in order to tell him why he had recommended *Brown*, and the witness then asked the defendant, if he had any thing more to communicate, and the defendant replied that he had not : that on this recommendation, the witness, in the absence of the plaintiff, delivered goods to *Brown* to the amount stated in the declaration, at a credit of four months.

It was proved, further, that on the 24th of *March*, 1806, *Brown* executed a bond to the defendant, with a warrant of attorney, for 2,175 dollars 27 cents, the one half payable in *August*, 1806, and the residue on the 1st of *November*, 1806 ; that a judgment was entered up on the bond, the 8th of *November*, 1806, and a *fieri facias* taken out for the whole sum, with interest, and delivered to the sheriff on the 10th of *November*, 1806 ; and the goods of *Brown* (who had absconded on the 4th of *November*) were seized on

the same day, and sold by the sheriff. Most of the goods found in the store of *Brown*, and sold under the execution, were the same which had been sold to him on the 23d of *October*, by the plaintiff, which the witness stated he knew to be the fact, as well from an inventory found in the desk of *Brown*, as from the marks on the goods; and that the goods sold for 404 dollars, which was a considerable sacrifice.

After the goods were taken in execution, and *Brown* had absconded, the plaintiff went to the defendant, and told him that he had falsely recommended a man who was good for nothing, and offered to take back the goods purchased of him by *Brown*, and which were then unsold by the sheriff, or take the note of the defendant for the whole amount, payable in eight months, but the defendant refused to comply with the proposal.

One *Case*, a clerk of the defendant, testified, that he was present at the conversation between the plaintiff's clerk and the defendant, and that the defendant said to him, that he believed *Brown* to be worth 4 or 5,000 dollars, as he had been told by a Mr. *Kibbe*, and the witness did not recollect hearing the defendant say any thing about *Brown's* punctuality, though he was near enough to hear all the conversation; that, in fact, *Brown* had not been punctual in his payments to the defendant; that the defendant trusted *Brown*, on the 1st of *June*, 1806, above 100 dollars, and offered to trust him further before he went away.

The deposition of *G. Kibbe* was next read, who testified, that some time in *June*, 1806, in answer to the inquiries made of him by the defendant, relative to the circumstances of *Brown*, he told the defendant that he believed *Brown* to be a man of honesty and integrity; that he owed some debts in *Vermont* and *New-Hampshire*, but that he believed the debts due to *Brown* there, and which were good, were more than sufficient to pay all the debts *Brown* owed there; and that *Brown* had lands in

*New-Hampshire* to the amount of 3 or 4,000 dollars; that he understood from the defendant that *Brown* was a considerable debtor to him, and that the inquiries were made by him to ascertain the responsibility of *Brown;* that he told the defendant that *Brown* would be able to pay him, and though he might not be punctual in his payments, he had no doubt but he would pay the defendant; that the witness observed further, that he knew one *Hawkins* was a debtor of *Brown* for about 600 dollars, and which he believed would be paid; that he further told the defendant that *Brown* was a respectable citizen, and considered as one of the most upright men, and that the witness had known him for five or six years, having lived within three miles of his house; that *Brown* had been a justice of the peace, that he had transacted considerable business with him, that before and after he came to reside near the witness, he had been considered a man of good character and of property; and that he considered him a man fit to be trusted, and on whom dependence might be placed.

The defendant then called a Mr. *Davis*, who had become a partner in trade with the defendant in the spring of 1806, who testified, that they credited *Brown* in *July* and *August*, 1806, about 124 dollars; that in the autumn of the year, they designed to deposit money in the hands of *Brown*, to purchase flax seed, and had perfect confidence in him to the time he went away, arising as well from a personal acquaintance as from the information derived from *Kibbe;* that during the summer of 1806, the witness and the defendant had a running account with *Brown*, which was paid.

The defendant then called the clerk of *Brown* as a witness, who testified, that he went to live with *Brown* in *July*, 1806; that after that time, there was a considerable quantity of goods in the store; that in *August* of that year there were goods to a greater amount than 1,100 dollars; that *Brown* absconded on *Tuesday*, the 4th *November*, and took no goods with him, and that the witness kept the store open until *Saturday* of that week, expecting his return,

having no suspicions of his situation ; that the de-
fendant was frequently in *Brown's* store, and lived in the
same house where the store was kept.

The attorney who entered up the judgment on the
warrant of attorney in favour of the defendant, against
*Brown,* stated, that he had always considered *Brown* as
a man of strict veracity and integrity; and that he ex-
plained to him the effect of the bond and warrant of at-
torney, which he had given to the defendant.

Several witnesses bore testimony to the good character
of *Brown,* and one of them stated that he sold him goods
on credit in *June,* 1806, to the amount of 300 dollars,
and that he had confidence in him, and would have trust-
ed him to the day on which he went away. It appeared
that the defendant, in his conversation with the clerk of
the plaintiff, when he recommended *Brown,* did not men-
tion the bond and warrant of attorney which he held.

The Chief Justice charged the jury, that the only in-
quiry for them was, whether the defendant had fraudu-
lently recommended *Brown ;* that it was a question of
fact, whether there was fraud or not, on which he should
give no opinion, but leave it with them to decide.

The jury found a verdict for the plaintiff for 646 dollars
and 15 cents.

A motion was made by the defendant to set aside the
verdict, as being against evidence.

Though the court did not examine or decide the ques-
tion of law, which was raised by the counsel, yet as they
were permitted to discuss it, and as it is a question of im-
portance, it has been thought proper briefly to state their
arguments.

*E. Williams* and *Sedgwick,* for the defendant. The
charge of fraud is easily made, readily received, and too
often supported by slender proof. It ought, however, al-
ways to be made out by the strongest and most unequivocal
evidence, especially where it is alleged to consist in *parol*
declarations, so liable to be misunderstood, and misrepre-
sented. The declaration in this case is, evidently, taken

ALBANY,
August, 1808.

Ward
v.
Center.

* 3 Term, 51.

from the one in *Pasley* v. *Freeman.** That action, as Mr. Justice *Grose* observed, was " as novel in principle as it was in precedent." That case, however, came before the court, on a motion in arrest of judgment, by which every fact stated upon the record was admitted to be true ; and the declaration expressly averred, that the defendant *intended* to deceive, and did falsely, *fraudulently*, and *deceitfully* assert, &c. and that he well *knew*, &c. Mr. Justice *Buller*, though he thought the plaintiff entitled to recover, agreed, that " no action could be supported for telling a bare naked lie," which he defines to be, " the saying a thing which is false, knowing or not knowing it to be so, without any *design* to injure, cheat, or deceive another person." He puts the case altogether on the *intention*, or corrupt motive of the defendant. He does not cite a case, nor put an example in which there was not either a *collusion* on the part of the defendant, or an *intention* to deceive and defraud; and those are cases of assertions by one of the parties to the contract against whom the action was brought. The *quo animo*, or intention, Mr. Justice *Ashhurst* states to be the *gist* of the action. *Fraud* or *deceit* is admitted, on all hands, to be the essence and foundation of this action.

‡ 2 East, 92.

In *Haycraft* v. *Creasy*,† there were, after repeated inquiries and cautions, reiterated assertions in which the defendant positively affirmed, from his *own knowledge*, that he knew Miss *Robertson* to be a person of large property, and that the plaintiff might *credit her with perfect safety*. Yet all the judges, except Lord *Kenyon*, were of opinion, that the action could not be maintained, without proving that the defendant *intended* to deceive and defraud the plaintiff; and they expressly declare, that *fraud* or *deceit* is the foundation of the action. In *Tapp*. v. *Lee*,‡ the court of *C. B.* held that there must be *fraud*, and an *intention* to deceive, satisfactorily proved, in order to support this action. They very reluctantly acceded to the doctrine of *Pasley* v. *Freeman*, that such an action would lie at all; and Lord *Alvanley* expressed his wish that the

‡ 3 Bos. & Pul.
367.

legislature would interfere, and restrain actions of this kind, unless the representations were made in writing; but after the determinations which had been made in the *K. B.* he considered himself bound to hold, that such an action would lie *ex delicto.* This court is not under the same embarrassment. Unshackled with any binding authority, there is no necessity to express any wish for a legislative interference.

In the case of *Evans* v. *Bicknell,** in which Lord *Eldon* has occasion to remark on the case of *Pasley* v. *Freeman,* he observes, that he considered the doctrine laid down in that case, as most dangerous in practice ; that when he was chief justice, he so far doubted the principle of it, that he always offered and recommended, that a special verdict should be taken, but for some reason or other, the offer was uniformly rejected ; and that " he could do no more than to point out to juries the danger of finding verdicts upon such principles." His Lordship thought it " most extraordinary, that if the plaintiff, in the case of *Pasley* v. *Freeman,* had come into a court of equity, insisting that the defendant should make good the consequences of his representation, and the defendant should positively deny that he made such representation, and only one witness should be produced to prove it, that equity should refuse any relief; and yet that under the very same circumstances, the plaintiff, in a court of law, should be enabled to recover :" Such a case would prove the absolute necessity of affording protection to the defendant, by a statute requiring all such undertakings to be in writing. This action, as has been observed in the case cited, certainly affords a very easy method of evading the statute of frauds, for if *A.* says to *B.* " trust *C.* and I will pay you," no action would lie against *A.* for the goods obtained by *C.* yet if *A.* had merely said, " *C.* is a good and responsible man," or " I am informed that he is a good and responsible man," he is held liable for all the *credit* which *C.* obtains from *B.* by that assertion, to an indefinite extent and amount. Ought a person to be thus made liable, perhaps, to more than the amount

* 6 *Ves.* jun. 185, 186.

of his whole fortune, for having answered to a question concerning the character of another, what, from the best information he possessed, he might fairly believe to be true? We are aware, that on a motion of this kind, it is not regular to discuss the question of law, and it would have been better, had the question come before the court on a motion in arrest of judgment, or in some other shape ; yet this affords an additional reason to induce the court to lay hold of slighter circumstances in the case, and to grant a new trial. In *Tapp* v. *Lee*, Lord *Alvanley*, though he could not say that it was a verdict against evidence, but as there were circumstances of suspicion, he thought the verdict ought to be set aside, on the payment of costs. In the present case, there is no ground to complain of the *misdirection* of the *Chief Justice;* but we have to regret that he did not, as appears to have been the practice of Lord *Eldon*, *caution* the jury against finding a verdict for the plaintiff.

But if we examine the evidence in this case, we shall find some ground to regard this as a verdict against evidence. Only one witness was produced on the part of the plaintiff, and he was the clerk of the plaintiff, and sold the goods on credit, in the absence of his master. The defendant is proved to be a person of a fair and honourable character, and this ought to have some weight against the testimony of a witness who may be biassed. The defendant said what he, no doubt, believed to be true ; and he explicitly stated the grounds of his belief, as derived from the information of persons in *Vermont*, where *Brown* had formerly lived ; thereby giving the plaintiff an opportunity to satisfy himself of the truth from the same source. All the witnesses coincide in declaring *Brown*, until the time of his departure, to have been a person of good character, and one whom they would have trusted. Not a single person in *Albany* expressed any doubt or distrust of him, except the clerk of the plaintiff, who made the inquiry, as *Brown* was a stranger to him. No attempt was made to prove, nor was it pretended there was any

*llusion* between the defendant and *Brown.* Some stress has been, and may be again laid on the circumstance, that the defendant did not mention to the clerk of the plaintiff, at the time he made the inquiry concerning *Brown,* that he had a bond and warrant of attorney against him. But the warrant of attorney was taken when *Brown* was a stranger to the defendant, and was not enforced until after *Brown* absconded. It was no lien or incumbrance, and the defendant was not bound to disclose it. The refusal of the defendant to give his note to the plaintiff for the goods, cannot be urged against him ; for had he accepted the proposal, it would have been an implied acknowledgment of fraud or collusion. By granting a new trial, in this case, on payment of costs, the court will not go farther, in the exercise of their power over verdicts, than the court of common pleas did, in a similar case, (*Tapp* v. *Lee*) in *England,* where doubts were entertained that justice had not been done.

*Henry* and *Ostrander,* contra. The ground of this action is a violation of that moral obligation, which is incumbent on every man, to speak the truth, and not deceive his neighbour, to his injury ; for it is agreed that fraud or deceit is the basis of the action, and the essence of fraud is deceit. The opinion of Mr. Justice *Buller,* and of the majority of the court in the case of *Pasley* v. *Freeman,* if attentively examined, will be found to rest on solid principles of law, as well as of morality and justice, which are the basis of all law. Every case put by Mr. Justice *Grose,* on whose opinion so much stress has been laid, was fully answered by Mr. Justice *Buller.* Where a person will falsely assert a fact, with intent to deceive, whereby another is injured, an action will lie ; though not where the representation is a mere matter of judgment or opinion. Lord *Kenyon,* in the case of *Haycraft* v. *Creasy,* considered the doctrine laid down in *Pasley* v. *Freeman,* as acquiesced in and established ; he considers it as well settled, on principles of morality and justice.

ALBANY,
August, 1808.

Ward
v.
Center.

The observations of Lord *Eldon*, on that case, are made in reference to the proceedings in a court of equity, where the oath of the defendant would countervail that of a single witness ; his objection is not so much to the principle of the action, as to the evidence by which it is supported in a court of law. But this rule of a court of equity, adopted from the civil law, has been questioned, for the oath of a disinterested witness ought, on principles of reason, to outweigh the oath of an interested party. Lord *Eldon* recognises the case of *Pasley* v. *Freeman*, and admits that it could have been maintained in a court of equity.

Again, as to the objection of the statute of frauds. A promise to pay for another is not binding, since the statute ; not because it ought not to bind, on principles of common law, and in justice ; but because of the positive rule, founded on principles of policy, and to guard against fraud, which requires it to be in writing.

*\* 1 East, 318.*    Lord *Kenyon*, in *Eyre* v. *Durnford*,\* and in *Haycraft* .v. *Creasy*, observed, that the statute of frauds had nothing to do with the case. The statute raises a legal presumption of fraud, for the want of certain formalities in contracts, but it does not apply where there is an action for an actual fraud or deceit. In *Tapp* v. *Lee*, *Chambre*, J. said that he did not think the statute of frauds extended to cases of this sort ; and " though the action was modern in practice, he should still think, even if there had been no decision on the subject, that it was founded on solid and legal principles."

This cause was left to the jury on a question of fact, as to the fraud and intention to deceive. Where there is a contrariety of evidence, it is the peculiar province of the jury to weigh the testimony, and draw the inference of fact. In such a case, the court never invades the province of the jury, by interfering to grant a new trial. The circumstance of the defendant's concealing the bond and warrant of attorney against *Brown*, was very properly urged to the jury, as a strong circumstance of fraudulent

intent. He might well suppose, that had he disclosed that fact to the plaintiff, he never would have trusted *Brown ;* since, if he were to sell him goods on credit, they would be liable, the next day, to be taken in execution, to satisfy the debt of another. Can it be said, that this was a verdict against evidence ? If not, on what ground is the present motion to prevail ?

VAN NESS, J. This is an application for a new trial, on a case made, and the only question now to be determined is, whether the court can deem the verdict so much against the weight of evidence as to justify the setting it aside. Whether this action can be at all sustained, is not the point now before us ; whenever that question arises, I shall be prepared to decide upon it.

The case of *Pasley* v. *Freeman,** seems to have been taken for law, but it never has, to my knowledge, received the sanction of this court. That the principles upon which that decision was made, have been carried far enough, has been admitted, and that this is an action not to be encouraged, so long as the provisions of the statute of frauds are considered salutary, I am fully persuaded. The basis of the action is fraud. Fraud is a crime. It is never to be presumed, but must be most conclusively proved. I think that I should never have given such a verdict as the jury have found in this cause. There is every reason to believe that the defendant had a full and perfect confidence as well in the integrity, as solvency of *Brown.* This is evident, from every part of his conduct. The defendant's partner, who had the same opportunity of knowing and judging of *Brown's* circumstances as the defendant had, did not at any time entertain the least suspicion of his being insolvent, and a number of *Brown's* neighbours concur in saying that their confidence in him was unshaken, until he absconded. To render the defendant responsible under such circumstances, on the ground of a fraudulent misrepresentation of *Brown's* credit and situation, appears to me, to say the least of it, to be *summum jus.* But notwithstanding

* 3 *T. R.* 51.

this, I am not prepared to say, that there is no evidence upon which the jury might find the fraud. They were not misdirected (as was the case in *Pasley* v. *Freeman*,) on a point of law. It certainly is a circumstance of some weight, that the defendant concealed the fact of his having in his possession the bond and warrant of attorney to confess judgment. Had he communicated this fact, I should have no hesitation in granting a new trial. Fraud is imputable, in some cases, as well where a man suppresses the truth, as where he represents what is false. Perhaps, if the existence of the bond and warrant of attorney had been disclosed, the plaintiff would not have given *Brown* credit for the goods. This part of the evidence, doubtless, had great influence with the jury ; and yet, I think it perfectly reconcileable with good faith and integrity, on the part of the defendant. Upon the whole, though with reluctance, I am of opinion, that it is not expedient to interfere with the verdict. The question of fraud has been fairly submitted to the jury, and they have found against the defendant. They had a right to do so ; though I may wish that they had done otherwise.

SPENCER, J. This case has been argued by the defendant's counsel, as though this was a motion in arrest of judgment, and the several cases decided in the *English* courts have been cited and commented upon in that view ; but we are only called on to decide whether the jury had sufficient evidence before them to justify their verdict on the issue joined between the parties.

*Humphrey* certainly proved the plaintiff's case ; and it was a question in some measure of credit between him and *Case*, *Humphrey* swearing that *Case* was not present, and *Case* testifying that he was, when the defendant made his representations to *Brown*. To which of these witnesses credit was due, it is not for the court to say ; the jury have seen fit to give credit to the testimony of *Humphrey*, and I see no reason to think differently. Had the fact been less doubtful on the point of falsely representing *Brown*, the witnesses to the defendant's general good, and,

indeed, exemplary character, would have turned the scale. As it is, I cannot say, that I am dissatisfied with the verdict.

I am, therefore, of opinion, that the defendant take nothing by his motion.

KENT, Ch. J. concurred.

THOMPSON, J. and YATES, J. not having heard the argument in the cause, gave no opinion.

Rule refused.